**UNITED STATES v. LEE TOWING CO. et al.**

**THE RICHARD J. BARRETT.**
**THE WILLIAM WIRT.**

United States District Court
S. D. New York.

Oct. 31, 1950.

Irving H. Saypol, United States Attorney, New York City, Max Taylor, New York City, for United States of America and respondent-impleaded.

Gerard M. McAllister, New York City, for Lee Towing Co.

Burlingham, Veeder, Clark & Hupper, New York City, Frederic Conger, New York City, for Tug Richard J. Barrett and E. E. Barrett & Co., Inc.

McGOHEY, District Judge.

The United States sues the Tug Richard J. Barrett, her owner and her operators for collision damage to the Navy Barge YC-749.

Since damage was not disputed, the only issue tried was liability and as to that I find the respondents blameless.

On the afternoon of May 8, 1943, the Tug Richard J. Barrett (hereafter called the Barrett) and the tug Port Edwards were pursuant to contract, assisting the William Wirt (hereafter called Wirt) to a berth at Pier K, Weehawken, New Jersey. The Wirt is a Liberty Ship. She is owned by libellant. At the time of the collision, the Wirt was light. She had steam up and was using her own engines for propelling power. The weather was clear, the wind was from the south and the tide was the last of the ebb. Respondent Lee

---

655

Towing Company had contracted with the libellant, through the latter's general agent, Alcoa Steamship Company, Inc., to provide tugs to assist in docking the Wirt. The contract contained the usual pilotage clause.[1] On the day in question, Lee Towing Company requested respondent E. E. Barrett & Co., Inc., to furnish tugs for the job. In compliance with this request, the tug Port Edwards, which is not charged with any negligence, and the tug Barrett, which is, were furnished. E. E. Barrett & Co., Inc., was the operator of the Barrett, and its managing owner was the claimant Edward E. Barrett. Captain Slauer, master of the Barrett, was on the Wirt's bridge, in charge of her navigation. Under the pilotage clause he thus became the libellant's servent "in respect to the giving of orders to any of the tugs * * *." In Captain Slauer's absence, the Barrett was under command of her mate, Captain Brittain.

Upon arriving off Pier K. the Wirt remained out in the stream some short distance south of Pier K. and Captain Slauer ordered Captain Brittain on the Barrett to go in and clear, sufficiently for docking, the berth intended for the Wirt. This was the in-shore berth on the south side of Pier K. and it was occupied by a Pennsylvania Railroad barge. The out-shore berth was occupied by the Liberty Ship Brewster owned by libellant. Alongside the Brewster, on her port side between amidships and her bow, lay three barges. The Hadley lay nearest the Brewster bow; just behind the Hadley and made fast to her with lines lay the Bulblite which was made fast to the Brewster. Outside the Bulblite and made fast to her lay the Navy Barge YC-749.

The necessity of moving the Pennsylvania Railroad barge from the in-shore berth was obvious. And Captain Brittain, on the Barrett, seems to have thought that it might be necessary, as well, to shift the barges lying alongside the Brewster. He came around close alongside the Navy barge, intending to put a line on her. At that point he received an "attention" signal from the Port Edwards which Captain Slauer had dispatched from the Wirt's side with orders not to shift the barges lying alongside the Brewster.

Captain Slauer's deposition was put in evidence. In it he says that after he sent the Barrett into the slip he determined that it was necessary to move only the Pennsylvania Railroad barge from the inner berth; that there was enough room to bring the Wirt to her berth without shifting the barges lying alongside the Brewster; and that he sent the Port Edwards after the Barrett to relay his orders.

Captain Brittain testified that when he received these orders he did not put any line on the Navy barge and did not disengage the lines running from that barge to the Bulblite. He said he pulled away from the Navy barge and proceeded to take the Pennsylvania Railroad barge from the inner berth and move it around to the north side of Pier K. This testimony was disputed by one Rizzo, a harbormaster employed by the stevedore handling the loading of the Brewster. Rizzo testified that he boarded the Barrett at the east end of the pier; that the Barrett then came alongside the Navy barge and, after putting lines on the Navy barge, Captain Brittain ordered him to "let go the lines" holding the Navy barge to the Bulblite, which he did, so that the Navy barge "was floating free." Thereupon, according to Rizzo, Captain Brittain "proceeded to push up" the Navy barge towards the Hadley which was just ahead of the Bulblite. Then suddenly Captain Brittain said he would leave the Navy barge where it was—"that it was all right." According to Rizzo, he made the Navy

1. "When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power, goes on board such vessel, or any other licensed pilot goes on board such vessel, it is understood and agreed that such tugboat captain or licensed pilot becomes the servant of the owner of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any damage resulting therefrom."

656

barge fast to the Hadley and then went aboard the Brewster, where the stevedores were working. I accept Captain Brittain's testimony on this point. There is no reason to suppose that an experienced tug master, as Brittain was, would leave the Navy barge "floating free" in a slip where he was going to berth a large ship.

The Navy barge was indeed moved from her position alongside the Bulblitc. But this I believe was done as described by Captain Slauer in his deposition. He said that as the Wirt was coming in he saw men on the Brewster's deck and men on the pier, hauling on lines from the Navy barge and pulling it forward towards the Brewster's bow. Captain Slauer on the Wirt's bridge was watching from its starboard side and, as the Wirt's stern came abreast of the Navy barge in its changed position, the barge, not being fast, drifted out or was drawn out by the suction of the Wirt's propeller. It struck the propeller and was damaged.

Libellant's claim rests solely on Rizzo's testimony which I do not credit. The damage was in no way attributable to the respondents.

Submit findings; conclusions and decree.